IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DARYL B.,[1]
    Plaintiff,

        v.                                 Civil No. 3:19cv280 (DJN)

ANDREW M. SAUL,[2]
Commissioner of Social Security,
    Defendant.

**MEMORANDUM OPINION**

On August 20, 2014, Plaintiff Daryl B. ("Plaintiff") applied for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the

"Act"), alleging disability from shoulder and stomach pain, memory issues and fainting

symptoms, with an alleged onset date of October 31, 2013.[3] The Social Security Administration

("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an

Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final

decision of the Commissioner.

---

[1]     The Committee on Court Administration and Case Management of the Judicial
Conference of the United States has recommended that, due to significant privacy concerns in
Social Security cases, federal courts should refer to claimants only by their first names and last
initials.

[2]     On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

[3]     Plaintiff initially alleged an onset date of December 1, 2010, but he later amended that
date to October, 31, 2013. (R at 2-3.)

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred by: (1) affording little weight to the opinion of state consultative examiner James O'Keefe, Psy.D.; (2) failing to account for Plaintiff's moderate limitations in concentration, persistence and pace in her residual functional capacity ("RFC") assessment; and, (3) failing to account for the inconsistencies between the *Dictionary of Occupational Titles* ("DOT") and the vocational expert's ("VE") testimony. This matter now comes before the Court on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[4] For the reasons set forth below, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 13), GRANTS Defendant's Motion for Summary Judgment (ECF No. 15) and AFFIRMS the final decision of the Commissioner.

## I. PROCEDURAL HISTORY

On August 20, 2014, Plaintiff filed applications for DIB and SSI, alleging disability from shoulder and stomach pain, memory issues and fainting symptoms, with an alleged onset date of October 31, 2013. (R. at 75-76.) The SSA denied Plaintiff's claims on September 23, 2015, and again upon reconsideration on January 19, 2016. (R. at 73-74, 111-12.) At Plaintiff's written request, the ALJ held a hearing on October 30, 2017. (R. at 32-72, 182-83.) On April 23, 2018, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 10-21.) On March 25, 2019, the Appeals Council

---

[4] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court.  (R. at 1-6.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'"  *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion.  *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'"  *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]."  *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case consideration, with deference to the presiding ALJ's credibility determinations).  In considering the decision of the Commissioner based on the record, the court must "take into account

whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. THE ALJ'S DECISION

On October 30, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 32-72.) On April 23, 2018, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 10-21.)

The ALJ followed the five-step evaluation process established by the Social Security Act in reaching her conclusion. (R. at 12-21.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 31, 2013, his alleged onset date. (R. at 12.) At step two, the ALJ found that Plaintiff had the following severe impairments: chronic pancreatitis with alcohol abuse; history of distal clavicle fracture (post-operative); and, mental disorders diagnosed to include antisocial disorder, dependent personality disorder, major depressive disorder and posttraumatic stress disorder ("PTSD"). (R. at 12.) At step three, the ALJ concluded that Plaintiff did not suffer from an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work with additional limitations. (R. at 14.) Specifically, Plaintiff could occasionally crawl and climb ladders, ropes and scaffolds; however, he could never reach overhead with the right upper extremity. (R. at 14.) The ALJ found that Plaintiff could perform unskilled work with a specific vocational preparation ("SVP") level of one or two involving simple, routine tasks with ordinary breaks and that involve things instead of people and "where the pace of productivity is not dictated by an external source over which he has no control." (R. at 14-15.) And the ALJ limited Plaintiff to occasional contact with supervisors and co-workers. (R. at 15.)

At step four, the ALJ determined that Plaintiff could not perform any past relevant work.

(R. at 19.)  However, at step five, the ALJ found that, considering his age, education, work experience and RFC, Plaintiff could perform jobs existing in significant numbers in the national economy, including the representative occupations of marker and packer.  (R. at 20.)  Accordingly, the ALJ concluded that Plaintiff did not qualify as disabled under the Act.  (R. at 21.)

<h2 style="text-align:center">IV.    ANALYSIS</h2>

Plaintiff, forty-three years old at the time of this Memorandum Opinion, previously worked as a forklift operator and a veneer stacker.  (R. at 19.)  He applied for DIB and SSI, alleging disability from shoulder and stomach pain, memory issues and fainting symptoms, with an alleged onset date of October 31, 2013.  (R. at 10.)  Plaintiff appeals to this Court, contending that the ALJ erred by:  (1) affording little weight to the opinion of state consultative examiner Dr. O'Keefe; (2) failing to account for Plaintiff's moderate limitations in concentration, persistence and pace in her RFC assessment; and, (3) failing to account for the inconsistencies between the DOT and the VE's testimony.  For the reasons set forth below, the ALJ did not err in her decision.

**A.    The ALJ Properly Afforded Little Weight to the Opinion of Dr. O'Keefe and Substantial Evidence Supports the Weight Assigned.**

Plaintiff first argues that the ALJ erred by affording little weight to the opinion of the state consultative examiner Dr. O'Keefe.  (Mem. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 14) at 3.)  Specifically, Plaintiff alleges that the ALJ did not cite sufficient reasons to support her conclusion that Dr. O'Keefe's opinion grossly overestimated Plaintiff's mental limitations.  (Pl.'s Mem. at 5.)  Plaintiff also argues that the ALJ engaged in inappropriate speculation when she opined that "Dr. O'Keefe's opinion is based more on subjective reports rather than objective findings."  (Pl.'s Mem. at 3.)  And Plaintiff contends that the ALJ improperly considered his lack

of mental health treatment in discounting Dr. O'Keefe's opinion. (Pl.'s Mem. at 5.) Defendant responds that the ALJ properly afforded little weight to Dr. O'Keefe's opinion and that substantial evidence supports the weight assigned. (Def.'s Mot. Summ. J. & Br. Supp. ("Def.'s Br.") (ECF No. 15) at 19.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 416.912. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. §§ 404.1527(f), 416.927(f). Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). The regulations also provide for the consideration of opinions from other sources. §§ 404.1513(a), 416.913(a).

A treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017). Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation; for example, when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. §§ 404.1527(d)(1), 416.927(d)(1).

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. §§ 404.1513a(b)(1), 416.913a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to state agency opinions. §§ 404.1513(a), 404.1527(e), 416.913(a), 416.927(e).

Courts generally should not disturb an ALJ's decision concerning the weight afforded to a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding the weight afforded to a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

Here, Dr. O'Keefe conducted a consultative examination of Plaintiff on June 16, 2015, during which he interviewed both Plaintiff and his mother. (R. at 17, 1370.) Dr. O'Keefe observed that Plaintiff appeared soft-spoken and quiet during the examination. (R. at 1370.) He also found Plaintiff to be a "vague historian," though Plaintiff maintained a relevant conversation and organized thoughts. (R. at 1370.) Plaintiff recounted that he had a ninth-grade education and dropped out of school after his then-girlfriend became pregnant with his son, with whom he remained close. (R. at 1371.) Plaintiff further recounted a traumatic motor vehicle accident in 2000 that occurred while he was driving his cousin, who passed away as a result of the accident. (R. at 1371.) Plaintiff also stated that he had survived a second motor vehicle accident in 2002, which left him in a coma for two weeks and affected his memory. (R. at 1371.) Plaintiff's mother averred that Plaintiff could not live alone after those accidents and described changes in Plaintiff's memory and cognitive abilities. (R. at 1371.)

When asked to describe his daily routine, Plaintiff recalled waking up around 9:00 a.m. and spending his day watching television or looking out the window. (R. at 1371.) Plaintiff also visited family members, including his son. (R. at 1371.) Plaintiff relayed that he consumed both alcohol and cannabis. (R. at 1371.) And Plaintiff denied driving or shopping alone, which Plaintiff's mother confirmed. (R. at 1371.)

In reviewing Plaintiff's mental health history and treatment, Dr. O'Keefe noted records indicating diagnoses of obsessive-compulsive disorder, alcohol abuse and a "Rule/Out for Psychotic Disorder, NOS." (R. at 1371.) Dr. O'Keefe also noted diagnoses of PTSD, cannabis abuse and depressive disorder. (R. at 1372.) Despite these diagnoses, Dr. O'Keefe observed that Plaintiff received no current psychiatric treatment or psychotropic medication. (R. at 1372.)

To analyze Plaintiff's existing mental and emotional capacity, Dr. O'Keefe used "items from the Mini-Mental State Examination" and a clinical interview of Plaintiff. (R. at 1372.) First, Dr. O'Keefe asked Plaintiff to recall certain information. (R. at 1372.) Plaintiff could not recall the date or season of the year, though he could recall the correct month, year and day of the week. (R. at 1372.) He could also recall the correct state and city where the examination took place, though he could not remember the county or street. (R. at 1372.)

To assess Plaintiff's immediate memory and ability to learn, Dr. O'Keefe asked Plaintiff to remember three unrelated objects after five minutes, and Plaintiff could recall two of the three objects after the first five minutes and, after being reminded, could recall all three objects after the second five minutes. (R. at 1372.) Plaintiff could not spell "world" or "dog" or complete Serial Sevens[5] and simple multiplication equations, explaining that he was "not good with math." (R. at 1372.) However, Plaintiff could add small numbers with the aid of his fingers. (R. at 1372.)

As for Plaintiff's intermediate memory and general fund of knowledge, Plaintiff could recall the current president but not the preceding three presidents, and Plaintiff could recall only John F. Kennedy when asked to name three presidents in general. (R. at 1372.) Plaintiff could

---

[5] This test assesses mental functioning and requires the subject to count down from one hundred in increments of seven. Robert Thomas Manning, *The Serial Sevens Test*, 142 <u>Archives of Internal Medicine</u> 1192 (1982).

not recall that Abraham Lincoln served as president during the Civil War. (R. at 1372.) However, Plaintiff responded that he would "dial 911" if he saw his neighbor's house on fire and would "run" if he smelled smoke in a crowded theater. (R. at 1372.) And Plaintiff demonstrated reasoning skills by noting that both dogs and cats are animals and apples and bananas are fruit, though he found that a table and chair are similar, because "you sit at and eat at" them. (R. at 1372.) Finally, Dr. O'Keefe asked Plaintiff to recall his Social Security number, birth date, address and phone number, and Plaintiff remembered only his birth date. (R. at 1372.)

Dr. O'Keefe then asked Plaintiff to rate his depression on a scale of one to ten, with ten being high. (R. at 1372.) Plaintiff rated his depression as a three or four, stating that it became worse whenever he thought about his motor vehicle accidents. (R. at 1372.) Plaintiff also described experiencing impaired sleep, including trouble staying asleep due to his headaches and stomach pain. (R. at 1372.) And Plaintiff stated that his stomach problems reduced his appetite. (R. at 1372.) Plaintiff averred that he cried "all the time" about the accidents and his inability to work, adding that he felt tired, apathetic and lethargic. (R. at 1372.) He also complained of shoulder pain. (R. at 1372.)

As far as his social life, Plaintiff denied socializing often and described himself as withdrawn, relying on his mother to go to the store. (R. at 1372.) Plaintiff stated that he had passive thoughts of suicide and hopelessness, as well as worry about his son and living alone once his mother passed away. (R. at 1372-73.) Although Plaintiff described experiencing panic attacks, Dr. O'Keefe opined that Plaintiff provided a "rather vague" description of those attacks. (R. at 1373.) However, Dr. O'Keefe credited Plaintiff's PTSD diagnosis, finding that Plaintiff abused both alcohol and cannabis and experienced sleep disturbances due to the 2000 motor

vehicle accident.  (R. at 1373.)  Plaintiff also described hearing his deceased cousin's voice since the accident.  (R. at 1373.)

Dr. O'Keefe then detailed Plaintiff's history of substance abuse, noting that Plaintiff began consuming alcohol at nineteen or twenty years old.  (R. at 1373.)  Plaintiff explained that he still consumed alcohol "on and off," though he could not drink as much because of his pancreatitis.  (R. at 1373.)  Plaintiff stated that he last drank alcohol approximately one week before the examination.  (R. at 1373.)  Plaintiff admitted to more frequent alcohol use following the 2000 motor vehicle accident and the death of his cousin, stating that he drank daily for two to three months.  (R. at 1373.)  Plaintiff recalled that he began using cannabis around the same time as alcohol and that he also used it daily.  (R. at 1373.)  Plaintiff told Dr. O'Keefe that at the time of the examination he smoked "a joint every day or two" and that he last smoked two days before.  (R. at 1373.)  And Plaintiff noted that he previously underwent substance abuse treatment.  (R. at 1373.)  Notably, despite his prior conviction for cocaine distribution, Plaintiff denied using either cocaine or crack cocaine.  (R. at 1373.)

Based on his assessment, Dr. O'Keefe diagnosed Plaintiff with mild alcohol use, dependent personality disorder, antisocial disorder, major depressive disorder and PTSD.  (R. at 1373.)  Dr. O'Keefe opined that Plaintiff had unresolved grief from the 2000 motor vehicle accident, which caused ongoing memories of the accident, avoidance of the scene, traumatic dreams, anxiety when riding in vehicles, sleep disturbance and self-blame.  (R. at 1373.)  Dr. O'Keefe justified the diagnosis of dependent personality disorder by pointing to Plaintiff's reliance on his mother for "executive decision-making functions."  (R. at 1373.)  And Dr. O'Keefe attributed Plaintiff's antisocial disorder to his juvenile misconduct and criminal history.  (R. at 1373.)  Further, Dr. O'Keefe described Plaintiff's alcohol and cannabis use as mild, though

the use increased with thoughts of the 2000 motor vehicle accident. (R. at 1373-74.) Dr. O'Keefe also pointed to Plaintiff's mother's statements that Plaintiff had lost cognitive functions since the motor vehicle accidents and also experienced auditory hallucinations. (R. at 1374.)

Considering Plaintiff's diagnoses, Dr. O'Keefe opined that Plaintiff could not manage his finances and provided a "guarded-to-poor" prognosis for Plaintiff's condition. (R. at 1374.) Despite his initial impression that Plaintiff constituted a "vague historian," Dr. O'Keefe ultimately described Plaintiff as a "fair historian," finding that both Plaintiff's mother and the records before him confirmed Plaintiff's statements. (R. at 1374.) Dr. O'Keefe opined that Plaintiff could not perform even simple, routine and unskilled tasks or maintain regular attendance. (R. at 1374.) And Dr. O'Keefe found that Plaintiff could not sustain attention. (R. at 1374.) Ultimately, Dr. O'Keefe precluded Plaintiff from performing even simple tasks with supervision, completing a normal workday and interacting with co-workers and the public. (R. at 1375.)

The ALJ afforded Dr. O'Keefe's opinion little weight, describing it as a "gross overestimate of [Plaintiff's] mental limitations." (R. at 18.) The ALJ noted that Plaintiff's medical records contained no mental health treatment, psychological findings or complaints. (R. at 18.) The ALJ also found Dr. O'Keefe's diagnosis of mild alcohol use inconsistent with the reports of Plaintiff's heavy alcohol use throughout the record, including Plaintiff's report of consuming multiple beers every day in August 2015 and 96 ounces of beer and 12 ounces of liquor every day in January 2017. (R. at 18.) The ALJ also noted reports of Plaintiff's drug use. (R. at 18.) Considering these inconsistencies, the ALJ opined that "Dr. O'Keefe's opinion [appeared to be] based more on subjective reports rather than objective findings." (R. at 18.)

**1.** ***The ALJ Did Not Err When She Opined that Dr. O'Keefe's Opinion Grossly Overestimated Plaintiff's Mental Limitations.***

Plaintiff first argues that the ALJ erred by describing Dr. O'Keefe's opinion as a "'gross overestimate of [Plaintiff's] mental limitations.'" (Pl.'s Mem. at 3 (quoting R. at 18).) Plaintiff contends that this statement "is contrary to the evidence and amounts to the ALJ substituting her lay opinion for that of a Doctor of Psychology." (Pl.'s Mem. at 3.) The Court disagrees.

Indeed, although the ALJ's statement that Dr. O'Keefe's opinion grossly overestimated Plaintiff's mental limitations, without more, provides an inadequate explanation for the weight assigned, the ALJ then explained why the opinion overestimated Plaintiff's limitations. (R. at 18.) Specifically, the ALJ stated that Plaintiff's records documented no mental health treatment and no positive psychological findings or complaints. (R. at 18.) Plaintiff contends that the ALJ could not discredit Dr. O'Keefe's opinion based on Plaintiff's lack of mental health treatment without considering possible reasons why he did not seek that treatment, (Pl.'s Mem. at 5); however, the Social Security Ruling ("SSR") to which Plaintiff cites, SSR 16-3p, applies only when analyzing the credibility of a claimant's subjective complaints, not when analyzing a medical opinion. *See* SSR 16-3p, 2016 WL 1119029, at *8 (providing that the Commissioner "will not *find an individual's symptoms inconsistent with the evidence in the record* [because the individual fails to seek frequent treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints" (emphasis added)). [6] The ALJ did not discredit Plaintiff's symptoms when she relied on his lack

---

[6]      Social Security Rulings are "final opinions and orders and statements of policy and interpretations" adopted by the Social Security Administration. 20 C.F.R. § 402.35(b)(1). "While [SSRs] do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995). Once published, these rulings bind ALJs. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); § 402.35(b)(1).

of mental health treatment to afford Dr. O'Keefe's opinion little weight; rather, she discredited the degree of limitation endorsed by Dr. O'Keefe, because the objective medical records provided little support for those limitations.  The regulations permit ALJs to discredit medical opinions for a lack of objective support.  *See* §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4) (providing that "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion" and that "the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion").  Accordingly, the ALJ did not err by relying on Plaintiff's lack of mental health treatment to discredit Dr. O'Keefe's opinion.

Moreover, in discrediting Dr. O'Keefe's opinion, the ALJ relied not only on Plaintiff's lack of mental health treatment but also noted that the medical record contained "no positive psychological findings or complaints."  (R. at 18.)  Indeed, during the relevant treatment period, Plaintiff's treating physicians repeatedly described him as alert and oriented, (R. at 666, 682), able to follow commands, (R. at 1305, 1466), calm, pleasant and cooperative, (R. at 941, 1215, 1224, 1466), and as having an appropriate mental status and memory, (R. at 695, 701, 1305).  Plaintiff also denied experiencing delusions, hallucinations, or depression.  (R. at 1440.)  These findings clearly undermine the extreme limitations endorsed by Dr. O'Keefe and support the ALJ's explanation for assigning Dr. O'Keefe's opinion little weight.

Ultimately, the ALJ's conclusion that Dr. O'Keefe's opinion constituted a "gross overestimate of [Plaintiff's] mental limitations" relied on specific and substantially supported observations about the inconsistencies between the objective medical evidence and the mental limitations endorsed by Dr. O'Keefe.  The regulations permit ALJs to make such observations. Accordingly, the Court finds no error.

**2.**    ***The ALJ Did Not Substitute Her Opinion for that of Dr. O'Keefe When She Stated that Dr. O'Keefe's Opinion Appeared to be Based More on Subjective Reports than Objective Findings.***

Plaintiff also argues that the ALJ improperly "played doctor" when she opined: "It appears Dr. O'Keefe's opinion is based more on subjective reports rather than objective findings." (R. at 18; Pl.'s Mem. at 3-4.) The Court finds this argument inapposite. Indeed, as mentioned, in deciding the weight to afford to a medical opinion, the regulations specifically permit ALJs to consider a medical opinion's supportability based on the record, including laboratory and clinical findings, and its consistency with the record overall. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4). The ALJ did just that in analyzing Dr. O'Keefe's opinion.

For one, as explained above, the ALJ properly pointed to the lack of support in Plaintiff's medical records for the limitations endorsed by Dr. O'Keefe. The ALJ also noted inconsistencies between Dr. O'Keefe's description of Plaintiff's alcohol use and the record, explaining that while Dr. O'Keefe diagnosed Plaintiff with only mild alcohol use, the record in fact illustrated a pattern of heavy drinking. (R. at 18.) Specifically, the ALJ referenced an August 2015 report in which Plaintiff described drinking multiple beers daily and a January 2017 report in which he described consuming ninety-six ounces of beer and twelve ounces of liquor every day — observations that the record supports. (R. at 18; *see* R. at 1389 (telling treating physician that he consumed "multiple beers every day[,] ounces per day" in August 2015), 1439 (telling treating physician that he "continues to drink daily (~ 96 oz of beer +/- 12 oz of liquor)" despite multiple pancreatic flares a month).) Indeed, Plaintiff often told hospital staff that he drank two to three drinks daily, (R. at 463, 488, 498, 509, 519, 665), and Plaintiff repeatedly received instructions to stop drinking, (R. at 486, 496, 663).

The ALJ further noted a discrepancy between Dr. O'Keefe's account of Plaintiff's drug

use and the record.  (R. at 18.)  Indeed, although Dr. O'Keefe's opinion stated that Plaintiff had "no history of using cocaine/crack" and mentioned only cannabis use, (R. at 1373), Plaintiff repeatedly tested positive for cocaine, (R. at 805, 810, 822, 869, 1205, 1311), opiates, (R. at 799, 1280, 1295, 1361), barbiturates, (R. at 1218), and amphetamines, (R. at 805, 1234, 1256, 1272, 1311, 1348).

Together, these inconsistencies support the ALJ's conclusion that Dr. O'Keefe appeared to rely more on the subjective reports of Plaintiff and his mother than on the objective medical evidence.  The regulations permit ALJs to make such observations when affording weight to medical opinions, and substantial evidence supports the ALJ's conclusions in this instance.  Accordingly, the ALJ did not err in affording little weight to Dr. O'Keefe's opinion.[7]

B.      **The RFC Properly Accounted for Plaintiff's Moderate Limitations in Concentration, Persistence and Pace at Step Three.**

Plaintiff argues that the ALJ failed to account for her step-three finding that Plaintiff experienced moderate limitations in concentration, persistence and pace when formulating Plaintiff's RFC.  (Pl.'s Mem. at 5-6.)  Specifically, Plaintiff asserts that the ALJ failed to explain why limiting Plaintiff to working with things instead of people addressed his limitations in maintaining concentration.  (Pl.'s Mem. at 6.)  And Plaintiff likewise contends that no evidence exists to support the ALJ's suggestion that Plaintiff's limitations in concentration, persistence and pace are caused by exposure to supervisors and co-workers or that restricting Plaintiff to a job in which the pace of productivity is not dictated by an external source would ameliorate any

---

[7]      Plaintiff also argues that "Dr. O'Keefe's opinion was, indeed, supported by objective evidence."  (Pl.'s Mem. at 4.)  However, Plaintiff ignores that "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'"  *Dunn*, 607 F. App'x. at 274 (quoting *Clarke*, 843 F.2d at 272-73).  Therefore, even if substantial evidence supports Dr. O'Keefe's findings, the Court will not reverse the ALJ when, as here, substantial evidence also supports the ALJ's assessment.

limitations in those areas. (Pl.'s Mem. at 6.) Defendant responds that the ALJ properly accounted for Plaintiff's limitations in concentration, persistence and pace, and that substantial evidence supports the ALJ's RFC assessment. (Def.'s Br. at 24-28.)

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. §§ 404.1545(b), 416.945(b). Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making his RFC determination; however, before making a determination that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. §§ 404.1545(a)(3), 416.945(a)(3).

The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis on the claimant's credible complaints. §§ 404.1545(e), 416.945(e). The ALJ must conduct a function-by-function analysis in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. The assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations. SSR 96-8p.

Relevant here, if the ALJ finds that the claimant has moderate limitations in maintaining concentration, persistence or pace at step three, the ALJ must address those limitations when formulating Plaintiff's RFC. *Mascio*, 780 F.3d at 638. Post-*Mascio*, reviewing courts must ensure that ALJs have appropriately accounted for those limitations in formulating the RFC. *See Kearson v. Colvin*, 2016 WL 4318968, at *5-6 (E.D. Va. Aug. 12, 2016) (finding that the RFC inadequately accounted for the plaintiff's moderate difficulties); *see also Handy v. Comm'r*, 2015 WL 9302972, at *3 n.4 (D. Md. Dec. 22, 2015) (explaining the distinction between moderate limitations and mild or no limitations). However, the Fourth Circuit in *Mascio* did not hold that a finding of moderate limitations in concentration, persistence or pace at step three must automatically translate into a RFC limitation. *Mascio*, 780 F.3d at 638; *see Shinaberry v. Saul*, ___ F.3d ___, 2020 WL 908887, at *4 (4th Cir. Feb. 26, 2020) (reaffirming that *Mascio* "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC"). Instead, the ALJ may exclude those mental limitations from the RFC if he explains why the limitations do not affect the claimant's ability to work. *Mascio*, 780 F.3d at 638. Without this explanation, the Court must remand the ALJ's decision. *Id.*

Here, at step three, the ALJ found that Plaintiff experienced moderate limitations in maintaining concentration, persistence and pace. (R. at 14.) In assessing Plaintiff's RFC, the ALJ limited Plaintiff to unskilled work with an SVP of one or two involving simple, routine tasks with ordinary breaks and that involve things instead of people and where the pace of productivity is not dictated by an external source over which Plaintiff has no control. (R. at 14-15.) The ALJ also limited Plaintiff to only occasional contact with supervisors and co-workers. (R. at 15.) The Court finds that the ALJ properly accounted for Plaintiff's moderate limitations in concentration,

persistence and pace in formulating Plaintiff's RFC and that substantial evidence supports the ALJ's RFC findings.

Unlike in *Masico*, in which the ALJ limited the plaintiff to only unskilled work, here, the ALJ specifically accounted for Plaintiff's moderate limitations in concentration, persistence and pace. *See* 780 F.3d at 635. For one, the ALJ accounted for Plaintiff's limitations in concentration by restricting him to unskilled work with an SVP of one or two involving simple, routine tasks with ordinary breaks and that involves things instead of people. *See Taylor v. Colvin*, 2016 WL 11431536, at *5 (N.D. W. Va. July 28, 2016) (determining that an RFC limiting the plaintiff to "unskilled work, a [SVP] of 1 or 2, and work involving things instead of people" properly accounted for the plaintiff's moderate limitations in concentration, persistence and pace), *report and recommendation adopted*, 2016 WL 4581338 (N.D. W. Va. Sept. 2, 2016); *Hillard v. Colvin*, 2016 WL 3042954, at *6-7 (D. Md. May 26, 2016) (holding that the ALJ accounted for the plaintiff's moderate limitations in concentration, persistence and pace by limiting him to "simple, repetitive, nonproduction work without frequent interaction with coworkers or the public").

Further, the ALJ addressed Plaintiff's persistence limitations by ensuring that Plaintiff had ordinary breaks during the workday. *See Burger v. Colvin*, 2015 WL 5347065, at *14 (W.D. Va. Sept. 4, 2015) (holding that the ALJ properly accounted for the plaintiff's moderate limitations in concentration, persistence and pace by limiting him to "tasks that involve only short simple instructions throughout an eight-hour workday with ordinary employer provided breaks"). And the ALJ accounted for Plaintiff's pace limitations by limiting him to an occupation in which he could set his own pace.[8] *See Wanda H. v. Saul*, 2019 WL 6709387, at *9 (E.D. Va. 2019)

---

[8]     Plaintiff argues that the evidence of record suggests that if allowed to set the pace of his own work, he would simply "ruminate and be off-task." (Pl.'s Mem. at 6.) But, again, substantial evidence review does not require the Court to reverse an ALJ when evidence in the

(opining that the "ALJ clearly accounted for Plaintiff's ability to stay on task and maintain pace by limiting her to simple, routine tasks with ordinary breaks and without an external source dictating her pace of work").

Importantly, the ALJ provided a narrative explanation of why the evidence of record supported the limitations that she endorsed. For one, the ALJ explicitly stated that the RFC took into account her step-three finding that Plaintiff experienced moderate limitations in concentration, persistence and pace. (*See* R. at 14 ("The following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental functional analysis.").) Indeed, although the ALJ noted Plaintiff's complaints of his inability to read or write and memory problems, (R. at 15), she found these complaints inconsistent with Plaintiff's overall lack of mental health treatment and his relatively normal psychological findings, (R. at 17-18). Of course, in relying on Plaintiff's lack of mental health treatment to discredit his subjective complaints, SSR 16-3p required the ALJ to consider reasons why Plaintiff did not seek such treatment, including his inability to pay. SSR 16-3p, 2016 WL 1119029, at *8-9. To that end, during his hearing, Plaintiff relayed that he had broken his collar bone and lacked the financial resources to "pay for . . . pills or go to [the] doctor's office," which suggested a reason why Plaintiff did not seek mental health treatment either. (R. at 52.) That said, the Court need not address this apparent error, because, in discrediting Plaintiff's subjective complaints, the ALJ also pointed to the absence of abnormal psychological findings in the record and confidential reports of Plaintiff's normal mental functioning and ability to socialize, rendering any error harmless.[9]

---

record supports an opposite conclusion. *Dunn*, 607 F. App'x. at 274. Because substantial evidence in the record supports the ALJ's findings regarding Plaintiff's ability to stay on task and maintain pace, the Court finds no error.

[9]     When confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine. *See Mascio*, 780 F.3d at 639 (analyzing whether the ALJ's

Indeed, substantial evidence in the record supports the ALJ's assessment of Plaintiff's mental capacity. For example, Plaintiff stated that he could maintain his personal hygiene, administer his medication, shop for groceries and prepare his own meals. (R. at 82.) On examination, Plaintiff followed commands, (R. at 1215), appeared calm and cooperative, (R. at 1215), and exhibited appropriate memory and normal judgment, (R. at 1215, 1441). And Plaintiff's medical records frequently mention normal psychological findings, with no indication of abnormal mood, affect, memory or concentration. (R. at 666, 676, 682, 695, 701, 936, 941, 1215, 1224, 1265, 1277, 1283, 1290, 1323, 1341, 1358, 1364, 1392, 1400, 1405, 1439, 1441, 1457, 1466.)

Moreover, the ALJ further discredited Plaintiff's subjective complaints by citing to an interview with a confidential witness who told investigators that Plaintiff assisted at the inn where he resided by delivering towels, checking the air conditioning and performing other tasks. (R. at 18 (citing R. at 1378-80).) Indeed, a confidential witness told investigators in August 2015 that Plaintiff "is very handy and helpful around the Inn" and had not "complained much about health problems." (R. at 1378.) The witness also affirmed that Plaintiff could function independently,

---

error in the credibility assessment constituted only harmless error); *Sharp v. Colvin*, 660 F. App'x 251, 252 (4th Cir. 2016) (deeming the ALJ's errors harmless). The burden of establishing a harmful error rests on "the party attacking the agency's determination." *Shineski v. Sanders*, 556 U.S. 396, 409 (2009). In determining the significance of an error, courts must consider, among other factors, "an estimation of the likelihood that the result would have been different." *Id.* at 411. Further, "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency 'can decide whether re-consideration is necessary.'" *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

Against this standard, the Court concludes that the ALJ's apparent error in failing to account for Plaintiff's reasons for not seeking mental health treatment when discrediting his subjective complaints carried no appreciable likelihood of changing the result, because the ALJ also relied on the absence of abnormal psychological findings and other evidence of record to discredit those same complaints and support the mental limitations in the RFC.

interact with others appropriately, display normal behaviors, focus, concentrate and remember normally, comprehend others and conduct business in an appropriate manner. (R. at 1379.) Plaintiff's parole officer told the same investigators that she observed no abnormalities in Plaintiff's mental abilities, which the ALJ aptly noted. (R. at 18, 1379.) And the ALJ likewise cited to the investigators' report that postings and comments on Plaintiff's social media accounts depicted an "active social life." (R. at 18, 1379.) Such findings clearly support the mental limitations in Plaintiff's RFC.

Ultimately, the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence and pace in her RFC assessment and provided an adequate and substantially supported explanation for the limitations that she endorsed. Accordingly, the Court finds no error.

### C. The ALJ Accounted for Apparent Inconsistencies Between the DOT and the VE's Testimony.

Finally, Plaintiff argues that the ALJ failed to account for apparent inconsistencies between the DOT and the VE's testimony. (Pl.'s Mem. at 7.) Specifically, Plaintiff contends that while the DOT's definitions of marker and packer require a reading rate of 95 to 120 words per minute, the ALJ ignored evidence that Plaintiff cannot read or write and failed to make a finding regarding Plaintiff's literacy. (Pl.'s Mem. at 7.) Without this finding of material fact, Plaintiff argues that the Court must remand. (Pl.'s Mem. at 7.) Plaintiff also notes that the occupation of packer involves the use of a conveyor, while Plaintiff's RFC required that he set the pace of his own productivity. (Pl.'s Mem. at 7-8.) Defendant responds that the ALJ made a finding that Plaintiff had a limited education, which permits Plaintiff to perform the occupations of marker and packer. (Def.'s Br. at 28.) And, even if the occupation of packer conflicts with Plaintiff's RFC, Defendant points out that the ALJ need only identify one occupation at step five.

(Def.'s Br. at 30.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant could perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 404.1566, 416.920(g), 416.966. The Commissioner can carry her burden in the final step with the testimony of a VE. §§ 404.1566(e), 416.966. During an administrative hearing, the ALJ must pose hypothetical questions to the VE that accurately represent the claimant's RFC, so that the VE can offer testimony about any jobs existing in the national economy that the claimant could perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

In *Pearson v. Colvin*, the Fourth Circuit explained the responsibilities of the ALJ regarding VE testimony. 810 F.3d 204, 208-10 (4th Cir. 2015). First, the ALJ must ask the VE whether his testimony conflicts with the DOT. *Id.* at 208; SSR 00-4p at 4. Second, and independent of the first step, the ALJ must obtain an explanation of apparent conflicts. *Pearson*, 810 F.3d at 208-09; SSR 00-4p at 4. Indeed, the ALJ need not address any and every conflict, nor can she address only obvious ones. *Pearson*, 810 F.3d at 209. Instead, the Fourth Circuit interprets apparent conflicts as those in which the VE's testimony "seems to, but does not necessarily, conflict with the [DOT]." *Id.* For example, an apparent conflict exists when an ALJ limits a claimant to only occasional overhead reaching and the DOT lists frequent reaching as a requirement for all of the jobs identified by the VE. *Id.* at 210.

Here, Plaintiff first argues that the ALJ erred by failing to make a finding regarding Plaintiff's literacy, (Pl.'s Mem. at 7); however, the Court notes that the ALJ in fact found that Plaintiff had a "limited education," which includes a literacy component, (R. at 20). Indeed, "limited education" denotes that a claimant has "reasoning, arithmetic, and language skills, but

not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3). Generally, a seventh through eleventh grade level of formal education qualifies as a limited education. *Id.* On the other hand, the regulations define illiteracy as "the inability to read or write." §§ 404.1564(b)(1), 416.964(b)(1). "Generally, an illiterate person has had little or no formal schooling." *Id.*

Although Dr. O'Keefe's assessment concluded that Plaintiff could not read or write, the record indicates that Plaintiff does not satisfy the regulations' definition of illiterate. (R. at 1374.) Plaintiff attended Park View High School and believed he completed either the eighth or ninth grade. (R. at 45, 62.) And a medical opinion issued by Edmund Creekmore, Jr., Ph.D., found that Plaintiff could read and write simple sentences. (R. at 325.) Therefore, substantial evidence supports the ALJ's conclusion that Plaintiff had a limited education and did not qualify as illiterate.

Moreover, the ALJ sufficiently addressed the impact of Plaintiff's potential illiteracy by soliciting testimony from the VE that the jobs of marker and packer do not require the ability to read or write and then addressing an apparent inconsistency between that testimony and the DOT. (R. at 68.) Specifically, during Plaintiff's hearing, the ALJ asked the VE if "any of the occupations that you identified today require reading and writing for completion," to which the VE replied "No." (R. at 68.) This testimony conflicted with the DOT's recommended language level for the occupations of marker and packer, which requires that an individual can read at a rate of 95 to 120 words per minute and print simple sentences. (DOT 209.587-034; DOT 920.685-026, DOT App. C). However, the ALJ addressed this conflict by explicitly asking the VE about the basis for his opinion on the requisite level of literacy for the identified jobs. (R. at 68.) The

VE responded that he based his opinion on his experience and training, which adequately resolved the conflict. (R. at 68); *see Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980) (holding that evidence of a vocation's requirements must be presented by "persons who have, through training and experience in vocational counseling or placement, an up-to-date knowledge of job requirements, occupational characteristics and working conditions, and a familiarity with the personal attributes and skills necessary to function in various jobs" — in other words, a VE); *Mullen v. Saul*, 2019 WL 3995982, at *4 (E.D.N.C. July 22, 2019) (holding that the VE appropriately accounted for an apparent inconsistency between her testimony and the DOT by testifying that she based her opinion on her experience and training (collecting cases)), *report and recommendation adopted*, 2019 WL 3995978 (E.D.N.C. Aug. 21, 2019). Accordingly, the ALJ sufficiently accounted for the apparent inconsistency between the VE's testimony and the DOT, and, based on the VE's testimony, the ALJ appropriately found that Plaintiff could perform the representative occupations of marker and packer regardless of his ability to read or write. *See Warf v. Shalala*, 844 F. Supp. 285, 289-90 (W.D. Va. 1994) (holding that the definitional requirements of the DOT are advisory in nature and not binding on an ALJ and affirming the ALJ's finding that the illiterate claimant could perform the occupation of flagger, even though the DOT stated that a flagger must read at a rate of 190-250 words per minute).

Finally, Plaintiff argues that the occupation of bottle packer identified by the VE requires the use of a conveyor, which proves inconsistent with the ALJ's finding that Plaintiff could perform only work in which he dictates the pace of productivity. (Pl.'s Mem. at 7-8.) The Court finds no such conflict. Indeed, the DOT describes the process of bottle packaging as positioning a carton, pressing and releasing a pedal and straightening the carton before pushing it onto a conveyor. (DOT 920.685-026.) These steps allow the employee to determine the pace of

production while utilizing a machine, and the conveyor comes into use only after the employee has performed his tasks at his own pace. Therefore, the occupation of packer identified by the VE does not conflict with Plaintiff's RFC. *See Mitts v. Berryhill*, 2019 WL 2346636, at *4 (D. Nev. Apr. 15, 2019) (holding that the similar occupation of insulation packer did not conflict with the plaintiff's limitation to only work in which he dictated the pace of productivity, because the occupation allowed the employee to determine his own pace while using a machine), *report and recommendation adopted*, 2019 WL 2341657 (D. Nev. June 3, 2019).

And, even assuming that the occupation of bottle packer proves inconsistent with Plaintiff's RFC, such inconsistency does not impact the ALJ's step-five conclusion, because, at step five, the ALJ need only identify one occupation existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1566(b), 416.966(b) (stating that work exists in the national economy if the ALJ identifies "*one* or more occupations" (emphasis added)). The ALJ satisfied this burden by identifying the additional occupation of marker. Accordingly, the ALJ did not err.

V.     CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 13), GRANTS Defendant's Motion for Summary Judgment (ECF No. 15) and AFFIRMS the final decision of the Commissioner. An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: March 26, 2020